IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

SHELBY WELTER and DEAN WELTER,
on behalf of themselves and their minor children,
A.R.B. and K.N.W.;
and STEPHANIE HUTCHINS,
on behalf of herself and her minor children,
J.H. and L.H.                                                                    PLAINTIFFS

V.                            CASE NO. 5:23-CV-5034

DETECTIVE JANICE WILSON,
Bella Vista Police Department                                       DEFENDANT

## MEMORANDUM OPINION AND ORDER

Before the Court are the parties' cross-Motions for Summary Judgment (Docs. 29 & 35).[1] This lawsuit concerns Bella Vista Police Detective Janice Wilson's transportation of four minor children to the Children and Family Advocacy Center ("CFAC") on March 4, 2020. The children lived with their parents, Plaintiffs Shelby and Dean Welter and Stephanie Hutchins, on Erith Lane in Bella Vista, Arkansas. Detective Wilson picked up two four-year-old children from the home and a seven-year-old child from her school, while another ten-year-old child was picked up from his school by a different officer. The children's parents did not want them to leave with police, and they were not allowed to accompany the children to the CFAC.

---

[1] In ruling on the Motions, the Court considered the following materials: Detective Wilson's Motion (Doc. 29), Brief in Support (Doc. 30), and Statement of Facts with Exhibits (Doc. 31); Plaintiffs' Response in Opposition to Wilson's Motion (Doc. 39); Plaintiffs' Motion with Exhibits (Doc. 35), Brief in Support (Doc. 36), and Statement of Facts (Doc. 37); Wilson's Response in Opposition to Plaintiffs' Motion (Doc. 40); and  Wilson's Response to Plaintiffs' Statement of Facts (Doc. 41). The Court also reviewed three videorecorded exhibits (Doc. 30-10, Doc. 30-12, Doc. 30-45) that were provided on a flash drive.

Two days before these events occurred, the Arkansas Department of Human Services ("DHS") opened a child maltreatment investigation targeting the children's parents. The investigation was triggered after police placed a call to the Arkansas Child Abuse Hotline to report the presence of drugs easily accessible to several children in a home where a fatal drug overdose had previously occurred. In connection with DHS's investigation of the Hotline report, the DHS case agent asked the CFAC's trained forensic examiner to question the children to determine whether the allegations of child abuse and neglect were substantiated.

The children and their parents do not accuse the CFAC examiner, the CFAC, the DHS investigator, or DHS of any wrongdoing. The only defendant is Detective Wilson. Plaintiffs accuse her of violating the Fourth Amendment rights of the parents and their children pursuant to 42 U.S.C. § 1983 by seizing the children to transport them to the CFAC. For the reasons explained more fully below, the Court **DENIES** Plaintiffs' Motion for Summary Judgment and **GRANTS** Defendant's Motion for Summary Judgment.

## I. BACKGROUND

On October 8, 2019, a friend of Plaintiffs Shelby and Dean Welter who was temporarily living with them at their home on Erith Lane overdosed on what was suspected to be fentanyl. Officer Haley Evans of the Bella Vista Police Department received a call from dispatch and arrived at the home when the medics did. The victim was rushed to the hospital and survived. The police obtained the remaining residents' consent to take crime scene photos and collect evidence, including pills found scattered on the table and floor. That same day, Officer Evans noted in her incident report that she called the Child Abuse Hotline to relay that children were living in the home when the

overdose occurred. *See* Doc. 31-2, p. 4 (Hotline Referral Number 2003424). It appears DHS failed to follow up on this call and open a child abuse investigation at that time.

The overdose victim was eventually discharged from the hospital and returned to the home where he overdosed a second time on October 15, 2019—this time fatally. His blood was positive for oxycodone, benzodiazepines, and cannabinoids, but not fentanyl. *See* Doc. 31-23.

Detective Reid Hudgens headed the narcotics division that investigated both overdose events in Plaintiffs' home. According to Detective Hudgens's declaration, the investigation slowed down significantly at the end of 2019 due to the COVID-19 pandemic. *See* Doc. 31-21, p. 2. He had planned to obtain a search warrant to search the house on Erith Lane just after the overdoses occurred, but he claimed "multiple officers [we]re needed to execute a search warrant" and the department was short-handed due to COVID-19 and the end-of-the-year holidays. *Id.* Months passed and no search warrant was sought.

By December 2019, Detective Hudgens had received the lab and toxicology reports confirming the identities of the illegal drugs found at the home and ingested by the overdose victim during in October. *See* Doc. 31-22 (Lab Analysis dated 11/4/19, verifying that one pill seized from the home on 10/8/19 contained alprazolam (better known by its brand name, Xanax) and the other pill contained fentanyl mixed with acetaminophen); Doc. 31-23 (Toxicology Report dated 12/16/19, stating that the deceased's blood was positive for oxycodone and benzodiazepines).

In February 2020, Detective Hudgens reopened the investigation by scheduling a "trash pull" of the residence. *See* Doc. 31-25. On February 26, Detective Hudgens,

3

Detective Wilson, and a third officer named Detective Kenneth Sabby combed through the Plaintiffs' trash and found containers of residue consistent with THC wax and a "sandwich sized bag . . . with the words 'green crack' written on it." (Doc. 31-26, p. 4). That same day, Detective Hudgens and a team of officers traveled to the home with a search warrant. There, they encountered three adult females, including Plaintiffs Shelby Welter and Stephanie Hutchins, as well as two small children. *See* Doc. 31-30, p. 5. Detective Hudgens noted in his report that "various items of drug paraphernalia were located in the common areas of the kitchen, kitchen cabinet and kitchen table." (Doc. 31-30, p. 5. A glass smoking device was on the kitchen table. *Id.* "In the living room on a small coffee table, there was a Ziplock bag, which contained a chunk of green leafy substance," which Detective Hudgens recognized as marijuana. *Id.* "On the floor near the edge of the coffee table there was a smoking bong laying on its side." *Id.* And in three different bedrooms there was drug paraphernalia and marijuana, all unsecured and "easily accessible by children." *Id.* Police took photographs of all these items. *See* Docs. 31-34 & 31-35.

On Monday, March 2, five days after the search warrant was executed, a Bella Vista Police Officer placed a call to the Child Abuse Hotline to report possible child endangerment and neglect at the Erith Lane home.[2] Bella Vista Police records confirm that Detective Sabby made the call after reviewing the evidence collected during the execution of the search warrant. *See* Doc. 31-30, p. 6 (Hotline Referral Number 20000350). Nevertheless, Plaintiffs believe Detective Wilson was the Hotline caller. *See*

---

[2] This was the second such call made by officers with regard to the Erith Lane home. The first call was made contemporaneously with the first overdose event on October 8, 2019.

4

Doc. 37, p. 2. It does not particularly matter which detective made the call, as both were mandatory reporters of child abuse and were personally familiar with the months-long drug investigation.

DHS opened a child abuse case on March 2, the same day as the Hotline call. According to the agency's Referral Report, the officer who made the call stated that a fatal drug overdose had taken place in the home "[s]everal months ago," but more recently, a search warrant revealed the presence of "marijuana, THC tar/wax, [prescription] pills, and drug paraphernalia (bongs and one hitters [sic])," all easily accessible to the children living in the home. *Id.* at p. 2. The caller described "[s]ome drugs" as being placed "next to baby bottles" and noted that "dog feces [were] everywhere." *Id.* There were "at least 5 dogs and at least 5 cats in the home," and in the caller's view, the living conditions for the children in the home were unsanitary and "unacceptable." *Id.* DHS labeled the salient risk factor to the children as "drug use" and identified the children's parents as the "[a]lleged [o]ffenders." *Id.*

DHS investigator Amanda Woodhams was assigned Plaintiffs' case. She testified that once the police make a report to the Child Abuse Hotline, state law allows DHS only "72 hours to see the child victim on the case." (Doc. 35-3, p. 22); *see also* Ark. Code Ann. § 12-18-602(a).

On March 4, two days after the Hotline call, Detective Wilson arrived at Plaintiffs' home dressed in plain clothes but wearing a gun and badge. Two uniformed officers accompanied her. She informed the adult Plaintiffs that they were the subjects of a child maltreatment investigation and that she was there to take the children to a forensic interview. The parents asked to see a warrant authorizing Detective Wilson to take the

5

children and were told a warrant was not needed. They asked if they or their lawyer could be present with the children during questioning and were told, "no." They also asked to speak to a DHS caseworker and again were told, "no." The adult Plaintiffs maintain that they were threatened with arrest if they refused to allow their children to go with the officers. When Detective Wilson went to the seven-year-old child's school to pick her up, the parents followed in their car but were told they could not check the child out of school or speak to her before she was questioned by DHS.

The parents now accuse Detective Wilson of kidnapping their children without authority or consent and argue that there was no exigency justifying her seizure of the children without a warrant. They maintain the children were "not in danger at the time of the seizure" because police had only "discovered a small amount of marijuana and paraphernalia when they served a search warrant at the home." (Doc. 36, p. 5).

Detective Wilson testified that a DHS official telephoned her to request police assistance in transporting the children to the CFAC. *See* Doc. 31-27, pp. 27–28. It is undisputed that DHS investigators are not permitted to transport children themselves. *See* Doc. 35-3, p. 45. Although Detective Wilson believed Ms. Woodhams had been the one to request the police transport, Ms. Woodhams denied this. *See* Doc. 35-3, pp. 50–51. Ms. Woodhams agreed, however, that "DHS will sometimes ask law enforcement to assist if the alleged offenders are the parents." *Id.* at p. 54. And she "[could not] say yes or no" as to whether her direct supervisor had been the one to request a police transport, though she knew that DHS supervisors "can" make such a request. *Id.* at pp. 54–55.

Regardless of who requested the police transport, there is no genuine, material dispute of fact that DHS intended Detective Wilson to bring the children to the CFAC

without their parents. When Detective Wilson arrived, forensic investigator Early Mallow and DHS investigator Woodhams were waiting for the children. They did not, however, expect the parents to be present, as CFAC policy prohibits "alleged offenders" from setting foot on CFAC property while alleged victims are being interviewed. *See* Doc. 31-50. Ms. Mallow questioned each child individually while Ms. Woodhams sat in the room taking notes. *See* Doc. 35-3, pp. 22–23. Detective Wilson and the other officers waited in a different room.

After the questioning was over, the children's parents were allowed to take them home. Investigator Woodhams conducted a home visit that same evening, accompanied by Detective Wilson, and found the living conditions adequate. In April 2020, DHS deemed the child maltreatment claims unsubstantiated and closed the case.

## II.  LEGAL STANDARD

A party moving for summary judgment must establish both the absence of a genuine dispute of material fact and its entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l Bank of Commerce of El Dorado v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999). The same standard applies where, as here, the parties have filed cross-motions for summary judgment. When no material facts are in dispute, "summary judgment is a useful tool whereby needless trials may be avoided, and it should not be withheld in an appropriate case." *United States v. Porter*, 581 F.2d 698, 703 (8th Cir. 1978). Each motion should be reviewed in its own right, however, with each side "entitled to the benefit of all inferences favorable to them which might reasonably be drawn from the record." *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983); *see*

*Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1998). In order for there to be a genuine issue of material fact, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III. DISCUSSION

Unsecured drugs of any kind present a health and safety threat to children. Fentanyl is a particularly lethal drug, and the home in question here was the site of a possible fentanyl overdose and a fatal oxycodone overdose. Having reviewed the crime scene photos taken on October 8, 2019, when the first overdose occurred, *see* Docs. 31-7, pp. 2–5; 31-8, p. 11, the Court finds it reasonable to assume that the children living in the home at that time were in danger. The photographs depict a glass table dusted with a powdery residue (recently ingested by the overdose victim) and pills strewn about the table and floor where any child could find them—including a Xanax tablet and a pill containing Fentanyl. *See also* Doc. 31-2, pp. 4–5. The police placed a Hotline call when the first overdose occurred, but it seems that DHS did not open a case and follow up.

Detectives Hudgens, Wilson, and Sabby reopened the investigation several months after the overdoses, first, by pulling the trash and looking for evidence of continuing drug use, and second, by obtaining a warrant to search the house. Plaintiffs downplay the results of the search and seem incredulous that anyone could take issue with the state of their home at the time—but the photographic evidence does not paint a particularly rosy picture. *See* Doc. 31-35. Police found a baby bottle in close proximity to a bag of marijuana, a smoking bong discarded on the living room floor like a child's

8

plaything, a pipe on the kitchen table, and marijuana and smoking devices (unsecured) in the adults' bedrooms.[3] These items appeared in a home where, in the past several months, a fentanyl pill was present, and an individual died of a drug overdose. Importantly, DHS opened a child abuse investigation—not Detective Wilson. And it was DHS that decided the time and place for the children's interviews.

Arkansas law explicitly authorized DHS to interview the children at the CFAC as planned. The Child Maltreatment Act permits "a psychological or psychiatric examination of all children subject to the care, custody, or control of the alleged offender." Ark. Code Ann. § 12-18-614. Such an examination "with the child victim . . . or any other children in the home or under the care of an alleged offender shall be conducted separate and apart from the alleged offender or any representative or attorney for the alleged offender." Ark. Code Ann. § 12-18-608(b)(1).

Given the undisputed facts set forth above, the only dispute for the Court to decide on summary judgment is whether it was clearly established that Detective Wilson's decision to take the children into her protective custody to transport them to the CFAC violated Plaintiffs' Fourth Amendment rights. The Fourth Amendment claim seems misplaced here. The Eighth Circuit has previously explained that "seizing a child who may be the victim of abuse presents a different Fourth Amendment dynamic than seizing an individual suspected of criminal wrongdoing." *Stanley v. Hutchinson*, 12 F.4th 834, 842 (8th Cir. 2021) (citing *Gates v. Tex. Dep't of Protective and Reg. Servs.*, 537 F.3d 404, 427–28 (5th Cir. 2008)). In the former case, "the child is seized to keep others from

---

[3] The definition of "abuse" under the Child Maltreatment Act includes "[g]iving a child or permitting a child to consume or inhale . . . (1) Marijuana." Ark. Code Ann. § 12-18-103(3)(A)(vii)(g).

9

harming him," while in the latter case, "the government seizes the individual in order to keep that individual from harming others. *Id.* According to the Eighth Circuit:

> We have never held that children have a Fourth Amendment right not to be separated from their parents absent probable cause to believe the parents are guilty of child abuse . . . . Although we stated [previously] that Fourth Amendment standards "properly framed" the issue, . . . we held that reasonable suspicion is the governing standard in this situation. The Fourth Amendment protects against *unreasonable* searches and seizures . . . . As the Supreme Court noted in *Stanley v. Illinois*, 405 U.S. 645, 653, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972), "We do not question the assertion that neglectful parents may be separated from their children."

*Id.* (emphasis in original).

This Court's task, therefore, is to "analyz[e] the totality of the circumstances at the time of the removal" of the children by Detective Wilson to determine if she had reasonable suspicion of child abuse. *Id.* at 840–41 (citation omitted). To recap, she knew the following facts at the time she picked up the children:

- there were two overdoses—one likely caused by fentanyl and one caused by oxycodone, which proved fatal—in the home in October 2019 when young children were present;
- a search warrant executed on February 26, 2020, revealed evidence of unsecured drugs and drug paraphernalia in areas of the house that were easily accessible to children, as well as dog feces and generally unsanitary conditions;
- police made a Hotline call on March 2, 2020, to report child neglect and endangerment;
- DHS opened an investigation; and
- DHS communicated with police about transporting the children to the CFAC on March 4 to be interviewed outside the presence of their parents.

The Court finds that knowledge of these facts supplied Detective Wilson with reasonable suspicion of child abuse.

However, even if she lacked reasonable suspicion, knowledge of these facts at least amounted to *arguable* reasonable suspicion of maltreatment or neglect, which

entitles Detective Wilson to qualified immunity for making a reasonable mistake as to the legality of her actions. *See Waters v. Madson*, 921 F.3d 727, 736 (8th Cir. 2019); *see also White v. Pauly*, 580 U.S. 73, 78–79 (2017) (per curiam ) ("Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.") (internal quotation marks omitted).

"Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam). It was not clearly established in March 2020 that it was unconstitutional for an officer to take children into her protective custody to transport them to a location for questioning at DHS's direction and in furtherance of an open child abuse investigation. The Court searched but was unable to locate any Eighth Circuit cases with a similar fact pattern. *See Dist. of Columbia v. Wesby*, 38 S. Ct. 577, 589–90 (2018) ("To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent" so that "every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.").

Plaintiffs have little to say in response to Detective Wilson's qualified immunity defense. They point out that "she did not observe any drug use or see any drugs or paraphernalia" when she picked up the children, nor did she know for certain whether these children were the same ones "who [were] living at the home at the time of the overdoses." (Doc. 36, p. 10). Plaintiffs' argument assumes that the only time children were subjected to potentially dangerous conditions in the home was during the fatal overdose in October. That is not the case. Moreover, it was not Detective Wilson's place to thwart

DHS's investigation and refuse to pick up the children for the interviews based on what she observed outside the home that day. Detective Wilson knew that DHS had opened a child abuse investigation based on evidence collected by her own investigative team. The agency was mandated under state law to act quickly and interview the children within seventy-two hours. She believed she was legally transporting the children at DHS's direction and is entitled to qualified immunity.

## IV. CONCLUSION

**IT IS ORDERED** that Defendant Janice Wilson's Motion for Summary Judgment (Doc. 29) is **GRANTED**, and Plaintiffs Shelby Welter, Dean Welter, and Stephanie Hutchins's Motion for Summary Judgment (Doc. 35) is **DENIED**. This case is **DISMISSED WITH PREJUDICE** with a separate judgment to follow.

**IT IS SO ORDERED** on this 26th day of June, 2024.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

12